**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| DONELL L. PRINCE,<br><br>　　　　　　　　Plaintiff,<br><br>v.<br><br>PRISCILLA PAJELA and JOHN DOE 1–10,<br><br>　　　　　　　　Defendants. | Civil Action No. 22-1939 (SDW) (JRA)<br><br>**OPINION**<br><br>April 24, 2024 |

**WIGENTON**, District Judge.

　　Before this Court is Plaintiff Donell L. Prince's ("Mr. Prince") Appeal of Magistrate Judge Jose R. Almonte's ("Judge Almonte") Order dated October 17, 2023, which denied Mr. Prince's request to file a motion for spoliation. For the reasons stated below, Mr. Prince's Appeal is **DENIED** and Judge Almonte's Order is **AFFIRMED**.

**I.　BACKGROUND**

　　Mr. Prince is a former resident of Room 5E (the "Apartment") at 104 James Street (the "Building") in Englewood, New Jersey. (D.E. 20 at 4–43 ("Amended Complaint") ¶ 2(a).) Defendant Priscilla Pajela ("Ms. Pajela") is the owner and operator of the Building. (*Id.* ¶ 2(b).) Mr. Prince alleges that Ms. Pajela intentionally exposed him to toxic fumes, chemicals, drugs, gas, pesticides, carbon dioxide, or other poisons in order to force him out of the Apartment, discredit him, and prevent him from pursuing his legal rights in two other lawsuits. (*Id.* ¶ 1.) Mr. Prince further alleges that other unnamed employees, residents, or visitors to the Building (the "John Does") were also involved in targeting his Apartment. (*Id.* ¶ 2(c).) In this action, Plaintiff sues

1

Ms. Pajela and the John Does for violations of the First Amendment, the Fair Housing Act, and 42 U.S.C. § 1983, as well as for common law conspiracy, negligence, inadequate security, and violations of N.J.S.A. § 2A:42-10.10–10.14, N.J.S.A. § 55:13B-1, N.J.A.C. § 5:27, the implied warranty of habitability, and the implied covenant of quiet enjoyment.  (*Id.* ¶ 1.)

### A. Factual Background

Mr. Prince has proceeded in this action pro se, and his allegations are at times difficult to understand.  The factual background that follows represents the Court's best efforts at parsing the Amended Complaint.  At this stage, the Court does not accept the allegations as true, but merely summarizes the Amended Complaint for the purpose of providing factual background.

For two years, Ms. Pajela and the John Does intentionally exposed Mr. Prince to toxic emissions in order to force him out, discredit him, and prevent him from pursuing his legal rights in two other lawsuits—one state suit against Ms. Pajela, and another federal suit against a Hackensack police officer.  (Amended Complaint at 5.)[1]  These toxic emissions persisted when Mr. Prince slept, prayed, ate, and showered, though the problem worsened when he worked on court filings in connection with the lawsuits, including the removal of yet another state suit to federal court.  (*Id.* at 6–7.)  In response, Mr. Prince had "to wear a respirator type mask[ ] and put plastic up to the wall to protect [himself] as much as possible [and] to give [him] time to open doors/windows to air out [the] room."  (*Id.* at 6.)  Mr. Prince "tried to take samples of these different substances, with inserts in [his] respiratory type masks, which [he] put in plastic bags with dates and times."  (*Id.*)  Likewise, Mr. Prince was "taking notes, listing dates and times[ ] when these different substances flood[ed] into [his] room, listed what [he] believed these substances were, [and took] pictures of holes put in walls all over [the] room."  (*Id.* at 5–6.)  Similarly, Mr. Prince

---

[1] Since the allegations in the body of the Amended Complaint are identified by recurring letters and numbers, internal pagination is utilized for ease of reference.

"used [an] air quality detection device to monitor/document the dates and times of [carbon dioxide] levels and these toxic fumes/chemicals and/or drugs that flood[ed] into [his] room." (*Id.* at 6.) And as the problem worsened, Mr. Prince used "a new air quality detection device to monitor and document the dates and times of these exhaust/[carbon dioxide] fumes." (*Id.* at 6–7.) Most of the toxic emissions emanated from the basement into the Apartment, which had a separate entrance from the Building. (*Id.* at 6.) As a result of the toxic emissions, Mr. Prince suffered significant medical issues, including lung, liver, kidney, blood, muscle, leg, eye, skin, and head maladies. (*Id.* at 7.)

Initially, Mr. Prince complained about the toxic emissions to Ms. Pajela, who suggested that she was not responsible for other tenants or common areas, and who commented to a John Doe that "these other types of people rent most of [her] room, [and] that's where most of the rent money comes from, so that's where her loyalty belong[s]." (*Id.* at 11.) Ms. Pajela also commented to a John Doe that "after [his] lawsuit against the police was over [Mr. Prince] was going to move out," and after Mr. Prince complained to a state inspector, Ms. Pajela stated "that she wasn't going to let anyone stay here who complains about problems which costs her money to make repairs." (*Id.*) Likewise, Ms. Pajela told a John Doe that "she was not going to let [Mr. Prince] live and work on a lawsuit against her, in her house." (*Id.* at 13.) Furthermore, Ms. Pajela operated the Building without insurance and allowed others to access the Apartment when Mr. Prince was away, providing copies of master keys to the police department, fire department, and others. (*Id.* at 11–12.) Indeed, Ms. Pajela stated "that no one has rights at her rooming house but her." (*Id.* at 12.) In response, Mr. Prince had to change the locks to his room, which caused additional conflict with Ms. Pajela. (*Id.* at 13.)

Between September 2018 and January 2020, Mr. Prince attempted to litigate habitability issues and request rent abatement in state proceedings with Ms. Pajela, who repeatedly attempted to evict Mr. Prince. (*Id.* at 8–9.) During eviction proceedings, Ms. Pajela lied about rent payments, falsely claimed that Mr. Prince was a threat to other tenants, tried to extort Mr. Prince, and misappropriated security deposits. (*Id.* at 12–14.) As a result of the lies, Mr. Prince requested a receipt for a rent payment, but Ms. Pajela started "yelling at [him] over and over to get the hell out of her house, that she didn't want [him] here, that she was going to get [him] out one way or another." (*Id.* at 13.) Similarly, Ms. Pajela "[b]ragg[ed] about how [Mr. Prince] was going to be evicted in a few days, [and] bragged [about] how she was going to show [Mr. Prince] how the real world works." (*Id.*) Meanwhile, problems at the Building escalated during the COVID-19 pandemic, and rent was neither paid nor sought. (*Id.* at 9.) Ultimately, in January 2022, Ms. Pajela sued Mr. Prince in state court over unpaid rent. (*Id.* at 9–10.) This lawsuit was the matter that Mr. Prince had attempted to remove to federal court, only to face increasing toxic emissions in the Apartment. (*Id.* at 10.)

Although Ms. Pajela initially suggested that she was not responsible for the toxic emissions, she ultimately worked with the John Does to perpetuate and conceal the problem. (*Id.* at 14.) For example, Ms. Pajela instructed a John Doe to seal the basement window with wood, siding, and foam sealer. (*Id.*) Moreover, Ms. Pajela told a John Doe "that even if someone figure[s] out what's going on in [the] basement, all we have to do is claim we know nothing about it and just claim [that] someone must have broken into the house/basement and did these things, [and] no one will be able to prove they had any direct involvement." (*Id.*) Through these measures, Ms. Pajela and the John Does aimed to attribute the presence of drugs to Mr. Prince, even increasing the toxic emissions before pain management appointments so that Mr. Prince would fail

his drug tests.  (*Id.* at 15.)  Additionally, Ms. Pajela repeatedly called Mr. Prince a "lazy drug addict," whether to a legal aid attorney or others in the neighborhood.  (*Id.* at 15–16.)

### B. Procedural Background

On April 4, 2022, Mr. Prince brought this action against Ms. Pajela and the John Does. (*See* D.E. 1.)  On August 21, 2022, Mr. Prince filed the Amended Complaint.  (*See* Amended Complaint.)  Mr. Prince subsequently filed a motion for leave to amend his pleading (*see* D.E. 41), which Judge Almonte granted in part (D.E. 64).  However, Mr. Prince opted to file a motion for reconsideration (*see* D.E. 67), which was administratively terminated pending resolution of the motion to withdraw filed by Ms. Pajela's attorney (D.E. 68).

On September 28, 2023 and October 10, 2023, Ms. Pajela and Mr. Prince brought discovery disputes before Judge Almonte.  (*See* D.E. 31; D.E. 33.)  Among other things, Mr. Prince claimed that Ms. Pajela discussed her intent to destroy evidence in the basement and his former room, and that she did so despite receiving a warning that discovery was ongoing.  (D.E. 33 at 2–3.) According to Mr. Prince, Ms. Pajela "responded that as far as she [was] concerned there [was] no discovery and then remarked go[od] luck finding some place to live."  (*Id.* at 3.)  In light of the destruction of evidence, Mr. Prince expressed his intent to file a motion for spoliation.  (*Id.*)

On October 17, 2023, Judge Almonte held a hearing to resolve the discovery disputes.  (*See* D.E. 40.)  At the hearing, Mr. Prince claimed that Ms. Pajela "intentionally destroyed evidence" even though he "reminded her that day that [he was] going to have an expert come by [for] testing." (*Id.* at 40:25–41:4.)  Mr. Prince further claimed that "[he] didn't want to tamper with the evidence so that the expert [could] come in and [could] take samples as it was without [him] taking stuff down."  (*Id.* at 41:9–11.)  According to Mr. Prince, "the majority of the evidence would come from the stuff that adhered to the plastic where they can do testing to find out what chemicals that [he]

5

was actually exposed to." (*Id.* at 42:17–20.) And according to Mr. Prince, Ms. Pajela "refurbished the room before [his] expert could get in there to do the testing" (*id.* at 47:8–9), and "[he] tried to get experts earlier on, but they said without an attorney, it wasn't going to work for [him] as a pro se" (*id.* at 47:23–25). Nevertheless, Judge Almonte found that the requested motion for spoliation was "frivolous" (*id.* at 49:16), though he allowed Mr. Prince "to submit a certification from an expert that convinces [him] otherwise" (*id.* at 50:4–5). Thereafter, Judge Almonte issued an Order, which denied Mr. Prince's request to file a motion for spoliation. (D.E. 36.)

On November 20, 2023, Mr. Prince filed the present Appeal (D.E. 42.) On December 4, 2023, Ms. Pajela's attorney filed a certification in opposition. (D.E. 44.)

## II.  LEGAL STANDARD

A district judge may reverse a magistrate judge's decision on a non-dispositive motion only if it is "clearly erroneous" or "contrary to law." 28 U.S.C. § 636(b)(1)(A); Fed. R. Civ. P. 72(a). "[A] finding is clearly erroneous when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Dome Petroleum Ltd. v. Emps. Mut. Liab. Ins. Co. of Wis.*, 131 F.R.D. 63, 65 (D.N.J. 1990) (citations omitted). "A finding is contrary to law if the magistrate judge has misinterpreted or misapplied applicable law." *Gunter v. Ridgewood Energy Corp.*, 32 F. Supp. 2d 162, 164 (D.N.J. 1998). "A district judge's simple disagreement with the magistrate judge's findings is insufficient to meet the clearly erroneous standard of review." *Andrews v. Goodyear Tire & Rubber Co., Inc.*, 191 F.R.D. 59, 68 (D.N.J. 2000). So too, "[a]n abuse of discretion is a clear error of judgment, and not simply a different result which can arguably be obtained when applying the law to the facts of the case." *Tracinda Corp. v. DaimlerChrysler AG*, 502 F.3d 212, 240 (3d Cir. 2007) (citations omitted). "An order regarding a discovery issue is considered a non-

dispositive matter and is reviewed for abuse of discretion." *Allen v. Banner Life Ins. Co.*, 340 F.R.D. 232, 236 (D.N.J. 2022).

### III.    DISCUSSION

The parties dispute whether Judge Almonte committed a clear error or an abuse of discretion when he denied the request to file a motion for spoliation. (D.E. 42 at 11–17; D.E. 44 at 2–6.) "The differences that would result under the different standards of review are few, if any," as Judge Almonte "would abuse [his] discretion if [he] based [his] decision on clearly erroneous facts." *United States v. Richards*, 674 F.3d 215, 223 (3d Cir. 2012) (citations omitted). However, Judge Almonte did not base his decision on clearly erroneous facts. Instead, Judge Almonte based his decision on the reasonable factual finding that the requested motion for spoliation was frivolous.

"Spoliation occurs where: the evidence was in the party's control; the evidence is relevant to the claims or defenses in the case; there has been actual suppression or withholding of evidence; and, the duty to preserve the evidence was reasonably foreseeable to the party." *Bull v. United Parcel Serv., Inc.*, 665 F.3d 68, 73 (3d Cir. 2012). Here, the evidence was in Mr. Prince's control before it passed into Ms. Pajela's control, as Mr. Prince installed the plastic before he was evicted by Ms. Pajela. Therefore, Mr. Prince had ample opportunity to test the plastic prior to any renovations. Although Mr. Prince argues that he could not retain an expert to conduct the testing, he also collected samples from respiratory mask inserts, utilized air quality detection devices, and gathered other temporal and physical data. Furthermore, Mr. Prince installed the plastic, not as a data collection tool, but as a protective mechanism. Based on these considerations, Judge Almonte reasonably could find that there was no actual suppression, even if other factors may have pointed to the withholding of evidence. In other words, Judge Almonte reasonably could find that Mr.

7

Prince failed to prove spoliation by a preponderance of the evidence. *See MaxLite, Inc. v. ATG Elecs., Inc.*, 15-CV-1116, 2021 WL 4520418, at *8 (D.N.J. Oct. 4, 2021) ("The party seeking sanctions for spoliation bears the burden of proof by a preponderance of the evidence that spoliation occurred.").

Plainly, this Court is not left with the definite and firm conviction that a mistake was committed by Judge Almonte. Accordingly, this Court need not decide whether it disagrees with the Order or would have reached a different result.

### IV.  CONCLUSION

For the reasons stated above, Plaintiff's Appeal is **DENIED** and Judge Almonte's Order is **AFFIRMED**.

                                                           */s/ Susan D. Wigenton*
                                                     **SUSAN D. WIGENTON, U.S.D.J.**

Orig:   Clerk
cc:     Parties
         Jose R. Almonte, U.S.M.J.